```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                          EASTERN DIVISION
```

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:12CR59CDP(MLM) |
| | ) | |
| CHRIS EDWARD REED, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter is before the court on defendant's Motion to Suppress Statements and Evidence. [Doc. 21] The government responded. [Doc. 25] An Evidentiary Hearing was held on July 10, 2012. Following the Hearing, defendant requested an expedited transcript and asked and was granted leave to file a supplemental memorandum following receipt of the transcript. On July 28, 2012 defendant filed a Supplemental Memorandum. [Doc. 32]

At the Hearing the government presented the testimony of Police Officer Thomas Penrod and Detective Leon Burton, both of the Union, Missouri Police Department. Defendant presented the testimony of Gene Gietzen, as an expert in the manufacturing of methamphetamine and clandestine laboratories. Having had an opportunity to observe the demeanor and evaluate the credibility of the witnesses, the undersigned makes the following findings of fact and conclusions of law.

# FINDINGS OF FACT

PO Penrod, who has been a Union Police Officer for six years testified that on November 25, 2009 he was on duty in the Union, Missouri Police Station. At approximately 1:00 A.M. he received a call from an individual stating he smelled a strong chemical odor, like ether, in the 600 block of North Washington. The caller specifically said it was coming from defendant Reed's address.[1] PO Penrod was familiar with defendant Reed's address because he had been there several times. He was also familiar with defendant Reed because it had been reported numerous times that defendant Reed was involved in the manufacture of illicit drugs. His experience with defendant Reed showed that he had a propensity for violence. PO Penrod had either arrested defendant or had been present when defendant was arrested. These arrests had nothing to do with methamphetamine. At that time PO Penrod did not know whether the defendant had any prior convictions. Next door to defendant Reed's address is an apartment building used for participants in Union's Drug Court.

Immediately after receiving the call, PO Penrod drove to North Washington to defendant's address. He could faintly smell a chemical odor with his windows half rolled down. PO Penrod guessed the temperature to be around 40 degrees. The wind speed was twenty miles per hour out of the west-south-west. He parked his police vehicle north of the area so as not to alert the occupants of the residence to his presence. As he walked near the Drug Court apartments an individual waived him

---

[1] Defendant Reed's address is 623 North Washington.

down.² The individual told PO Penrod he had smelled an odor from inside their common apartment area and when he went outside to smoke and walked around the block he smelled an extremely strong odor of chemicals. PO Penrod told the individual to go back inside his apartment and as PO Penrod walked towards defendant's residence he could smell an extremely strong chemical odor coming from the corridor between the Drug Court apartments and defendant's residence. PO Penrod was asked to describe the odor. He said "...the only time I've ever had a smell that's similar is when trying to start an old car using starting fluid." When asked if it was the smell of ether, he said "Correct." Transcript ("Tr.") p.22, lines 1-4. After smelling the strong odor he went back to his car and notified other officers.

He called Police Officers Sieverling and Schlitt who were on duty that night and called Det. Burton because he is specially trained to deal with clandestine methamphetamine labs. The four met at the "SwimPlex" within the city park which is approximately two-three blocks from defendant Reed's residence. They notified Franklin County so they would know where to send help if issues arose. They planned to have Det. Burton and POs Schlitt and Penrod approach from the north and PO Sieverling secure the rear of the residence.³ When the Officers reached the

---

²     The individual was later identified as Lonnie Mahan.

³     PO Penrod described defendant's residence as follows: "The apartment faces Washington, which is east, extends back, and it has another exit to the south at the rear of the apartment, and there is another apartment building just, or apartment just to the east of that. The building that Mr. Reed was in and the Drug Court buildings I believe share a wall to the north, and between those two buildings,

corridor between defendant's residence and the Drug Court building they could see a fan blowing out in the open window of defendant's bathroom and a light on in the bathroom. They isolated the source of the odor as coming from the corridor.

PO Schlitt and PO Penrod stayed at the corridor; Det. Burton went to the front door and PO Sieverling secured the south door.

Det. Burton knocked on the front door several times. There was no response but the light in the bathroom went off. PO Penrod guessed Det. Burton knocked 15-20 seconds. Det. Burton then went to PO Sieverling's location at the back door and PO Penrod moved to the southeast corner of the building from which location he could see both Det. Burton and PO Schlitt.

Again, Det. Burton knocked on the back (south) door and identified himself as a Police Officer and asked the defendant to open the door. There was no response. Eventually Det. Burton forced the door open. PO Penrod went with Det. Burton and PO Sieverling into the residence. PO Sieverling ordered defendant Reed to the ground and he eventually complied. He placed defendant under arrest. Defendant's girlfriend Katie Pittman and her nine year old child were also present in the residence as was a Savannah Driscoll.

PO Penrod had no specialized clandestine lab training other than in the Police Academy. Defendant introduced a photograph of the residence at 623 North Washington. Def.Ex. D-1. The photo shows the building to the right of defendant's

---

about the halfway point, there is a long, probably, I'm guessing 36-inch by maybe 20 or 30-foot corridor back to Mr. Reed's apartment bathroom." Tr. at p.9, lines 16-23.

residence bearing a sign reading "Sundance Bar and Grill." The Sundance has been renovated into apartments and the Drug Court apartments are actually behind the Sundance at 625 North Washington. Def.Ex.D-2 shows the corridor between 623 and 625 and the bathroom window in defendant's residence. Def.Ex.D-3 is PO Penrod's Police Report which makes no mention of the bathroom lights going off during Det. Burton's knocking on the front door. PO Penrod testified he was not aware of whether Det. Burton gave defendant his Miranda rights. Det. Burton seized the evidence. Neither the occupants of the residence nor the officers went to the hospital to be checked for methamphetamine exposure.

Det. Burton, who has been with the Union Police Department for over seventeen years, testified that he has had extensive training in methamphetamine investigations. He is "lab certified" and is usually the one that gets called first for methamphetamine investigations. On the morning of November 25, 2009 he was off duty and responded from home to PO Penrod's call. He drove by defendant's residence and detected a strong chemical smell coming from the building. This type of chemical odor can be hazardous to one's lungs. He believed the odor to be ether. He then went to the SwimPlex parking lot and met the other officers. PO Penrod informed him of the call he had received from the witness, the chemical odor he detected and his conversation with the witness who said he "believed it was Reed." The officers' plan included knocking on the door and if no one answered, to force entry because of the health hazards of the chemical smell.

Prior to that morning, Det. Burton was familiar with defendant Reed from an incident in which defendant Reed was in jail, was let out for a funeral and did not come back. A warrant was issued and Det. Burton arrested him in his girlfriend, Katie Pittman's, car. He also might have talked to him "a couple of times" and knew defendant had gotten into fights with officers from other jurisdictions. He had no personal knowledge that defendant was involved with methamphetamine. He had been to defendant's residence "a handful of times" for disturbances with Katie Pittman and neighbors.

Det. Burton knocked on defendant's front door and announced "Police" two or three times. PO Sieverling said he heard somebody inside, talking at the back of the apartment. Det. Burton believed he was at the front door approximately one minute to a minute and a half. He said it seemed like a long time waiting for an answer. When there was no response, he went to the other door (the back or south door). He knocked again and announced "Police" twice and told them if they did not open the door, the officers would kick it in. [4] There was no response so he kicked in the door.

Det. Burton followed PO Sieverling inside. They initially found defendant, and the other female. Katie Pittman and her child were in the front of the residence. Defendant appeared angry with clenched fists. All four Officers had their weapons

---

[4] Det. Burton said he did not kick in the front door because the front of the residence is where the kids slept and the lights were off so he thought they might be sleeping. The officers heard people at the other door and the lights were on there and it was defendant and Katie Pittman's bedroom/living area.

- 6 -

drawn. PO Sieverling told defendant to get on the ground several times. He eventually complied and PO Sieverling placed defendant under arrest.

Det. Burton testified he did not read defendant his <u>Miranda</u> rights nor did he believe any of the other Officers read him his rights. After defendant was arrested Det. Burton asked him for consent to search the residence. Defendant said to the effect that "This ain't my apartment, I don't care what you do." Det. Burton believed this was the equivalent of consent. He also spoke to Katie Pittman. He asked her what had been going on in the residence. She explained and then he asked her for permission to search. She consented. Neither defendant nor Ms. Pittman appeared under the influence of drugs or alcohol. Following the search, Det. Burton seized numerous items associated with the manufacture of methamphetamine. <u>See</u> Crime Scene Inventory, Gov.Ex.G. The starting fluid, shown in photograph Def.Ex.D-4 could have been the source of the ether smell to which Det. Burton previously testified. The can was empty and had a hole punched in the bottom. The government introduced photographs of each of the items seized, Gov.Ex.A-F. <u>See also</u> Def.Ex.D-4.[5] Gov.Ex.A shows the fan facing out of the bathroom window. Gov.Ex.B shows an empty bottle with a tube coming out of the top of it going into the bathtub. This is used as a gassing chamber in the methamphetamine manufacturing process. There is also a toilet in the photo. Gov.Ex.C shows items found in a trash bag at the residence. It shows empty blister packs of pseudoephedrine and a Wal-

---

[5] All the photographs and other Exhibits as well as the Transcript will be provided to the District Court.

phed box of pseudoephedrine. Pseudoephedrine is the key ingredient in the manufacture of methamphetamine. There is a broken glass bottle with a cotton ball-like object used as a filter in the top. There is a bag with the word "ice" visible, which is a cold or ice compress. There are some paper ribbons from inside batteries which Det. Burton believed to be lithium batteries which are used in the methamphetamine-making process. Gov.Ex.D shows a Gatorade-type bottle with residue in it which could be the leftover pill wash. Gov.Ex.E shows coffee filters which are also used in the manufacture of methamphetamine. Gov.Ex.F shows another bag of trash.

None of the Officers wore any sort of protective gear such as a Tyvek suit or a respirator. Det. Burton said they should have worn protective gear but the three Officers are not methamphetamine lab certified and do not have protective suits. Det. Burton simply did not wear his suit. Neither the Officers nor the residents were examined at a hospital; none of the seized items were taken to the lab except some marijuana. The evidence was eventually destroyed.

Defendant presented the testimony of Gene Gietzen. For purposes of the Evidentiary Hearing only, the government stipulated that Mr. Gietzen qualifies as an expert in the manufacture of methamphetamine and clandestine labs. Def.Ex.D-6 is Mr. Gietzen's CV. In every case in which he participates, Mr. Gietzen uses the same process: he reads all the reports, makes a list of the items of evidence that were collected and from where they were seized, examines the photographs and compares the evidence in the photos to the written documentation.

Mr. Gietzen said the "ubiquitous" term "chemical odors" is applied to anything at a clandestine methamphetamine lab. It has "almost no specificity in the nature of the odor." Tr. p. 57, lines 21-24. He identified several items that were seized and photographed that could produce an odor. Specifically, the starting fluid can depicted in Def.Ex.D-4 contains dimethylheptane which would produce an ether smell. However, he was emphatic that he saw no puncture marks in the can. He said "In the clandestine world if somebody is using ether, very often you will find the aerosol can is punctured so they can get all of the liquid out as opposed to just whatever part is in while there is still pressure, and I found no evidence of puncture marks." Tr. p.63, lines 7-14. It is to be noted that Det. Burton said the puncture was in the bottom of the can and is not visible in the photo. However, there is no mention of puncture marks in the police reports. In addition, for example, the bottle with the tube coming out of the top, Gov.Ex.B, if it were used as a gassing chamber, would produce an odor like Clorox bleach. Tr. p.60, lines 3-10. However, Mr. Gietzen was unwilling to say it was anything other than a bottle with a tube coming out, absent lab work describing the residue in the bottle. He said the two common ways of generating hydrogen chloride gas are muriadic acid and aluminum foil or sulphuric acid and salt. However, there was no evidence of any of these items found at the scene. He said that the hydrogen chloride gas is a strong bleaching agent and the bathtub into which the tube is draining shows no sign of being bleached. Def.Ex.D-7. Tr. p.61, lines 17-18; 22-25; p.62, lines 5-7.

Mr. Gietzen went on to discount each of the items seized as being inconclusive as to whether methamphetamine was being manufactured in defendant's residence. He testified at great length. See Tr. pages 57-78.

The court is confused as to the purpose of Mr. Gietzen's testimony with regard to suppression issues. While testimony of this nature may complicate the government's burden of proof at trial, it has no relevance to the issues before this court, namely whether there were Constitutional violations during the search and seizure of the evidence. The only possible relevance is his testimony about the ether odors smelled by the witness and the Officers. If there was no ether odor, the Officers would have had no probable cause or exigent circumstances to justify kicking in defendant's door. (See Conclusions of Law below)

Mr. Gietzen testified he "found no presence of ether," an odd statement because he was not present at the scene. He said:

> If ether is sprayed, it is a liquid, and it will remain a liquid for a period of time. I don't know what period of time you're suggesting this preparation transpired over, but ether will remain a liquid for a period of time, and that is why I rendered the opinion about the no evidence of preparation, or even a cook because of the lack of these types of items. Tr. p. 74, lines 1-6.

When asked if he was testifying that in his professional opinion the Officers and the witness did not smell ether (i.e. not telling the truth) he replied he did not know the source of the non-specific chemical odor. He admitted ether can be used to manufacture methamphetamine and there was an empty ether can in the residence. The following colloquy took place:

> Q...The law enforcement officers have represented to the court that the can was empty. Are you telling the court that no matter whether or not the can was empty, or not, it is impossible for the ether to become an odor, and for that odor to emanate outside the apartment? Tr. p.74, lines 21-25.
>
> A...I guess my answer to that question would have to be if the officers indicated that there was an ether odor, they should have noted it as an ether odor, not a chemical odor. Tr. p.75, lines 1-3.
>
> Q...Sir, that's why you are an expert. You looked at all of the reports, you looked at all the photographs, you've made your professional opinions, so I'm asking you, you saw a can of ether. Could the odor from that apartment have been ether? Tr. p.75, lines 12-17.
>
> A...I can't answer that question. Tr. p. 75, line 18.

Mr. Gietzen testified that some of the 450 labs that were previously submitted to him had fans. His opinion in those instances was "there was a fan." Tr. p.77, line 1. The temperature on the morning in question was approximately 35-40 degrees and there was a fan blowing out. Gov.Ex.A. However, Mr. Gietzen had "no idea" why they would do that.

Mr. Gietzen also testified about an article he wrote for the Federal Public Defender entitled "Endangering Human Life and the Environment."

> Q...Oh, I'm sure you did, because at the very beginning, you talked about ether, where an investigator testified that one can of ether was equivalent to one stick of dynamite. Later on in your article, you wrote that all methamphetamine labs bear a potential danger, they involve chemical reactions, solvents, gas and substances that when mixed will generate heat. They could occur. You mentioned about potential danger versus real danger. Tr. p.77, lines 12-19.

He went on to say that in the present case any danger from ether would have been eliminated because the can was empty.

The court finds Mr. Gietzen's testimony to be evasive and less than forthcoming. When asked a direct question, he either equivocated or said he did not know. His credibility suffered because of his refusal to articulate obvious facts.

## CONCLUSIONS OF LAW

**1.    Knock and Talk**

The Officers initial plan was to knock on the door(s) of the residence and attempt to talk to the residents to investigate the ether odor apparently coming from the window in the corridor next to the house. The court finds the Officers' testimony about the strong chemical odor which they said smelled like ether to be fully credible, Mr. Gietzen's equivocation notwithstanding.

The "knock and talk" technique is frequently employed by law enforcement officers and has been described with approval by the Eighth Circuit Court of Appeals. United States v. Heath, 58 F.3d 1271, 1273 n.3 (8th Cir. 1995)("knock and talk" is a casual conversation between officers and the target of an investigation), cert. denied, 516 U.S. 892 (1995). Other jurisdictions have also approved the practice: United States v. Miller, 933 F. Supp. 501 (M.D.N.C. 1996)("knock and talk" procedure consists of knocking on a suspect's door to engage in conversation regarding narcotic activity occurring at the suspect's residence and then seeking the resident's consent to search); United States v. Powell, 929 F. Supp. 231 (S.D.W.Va. 1996)("knock and talk" is where the officer (1) visits the residence (2) identifies himself (3) asks to be admitted and (4) then seeks consent to search); United States v. Roberts, 928 F.

Supp. 910 (W.D.Mo. 1996)("knock and talk" officer knocks on door of room, identifies self and asks to speak to a person about what has just occurred in the room); United States v. Cruz, 838 F. Supp. 535 (C.D. Utah 1993)("knock and talk" is procedure where officers knock on the premises and seek to enter to talk to the defendant and obtain consent to search thereby obviating need to obtain search warrant and allow more expansive search than would be lawful pursuant to an arrest of defendant).

The utility of this procedure to law enforcement is obvious because it avoids the necessity for securing a search warrant from a judicial officer. There is, of course, potential for abuse but courts such as those listed above and commentators appear to concur that the practice is lawful. See, e.g., United States v. Cruz, 838 F. Supp. at 543, collecting cases; see 1 WAYNE R. LAFAVE, SEARCH AND SEIZURE, § 2.3(b)(1996). For a general discussion of the "knock and talk" technique under Missouri and Federal law, see Swingle, H. Morley, and Zoellner, Kevin M., Journal of the Missouri Bar, Jan.-Feb., 1999, p. 25-30.

2.     **Probable Cause and Exigent Circumstances**

The Eighth Circuit has clearly endorsed the "plain smell" rule. United States v. Clayton, 210 F.3d 841, 845 (8th Cir. 2000) (once inside, officer quickly developed probable cause for a search based on his immediate perception of an odor associated with methamphetamine production), citing United States v. McCoy, 200 F.3d 584 (8th Cir. 2000) ("plain smell rule"). "Just as evidence in the plain view of officers may be searched without a warrant, see Harris v. United States, 390 U.S. 234, 236.

. . 1968), evidence in the plain smell may be detected without a warrant." United States v. Lyons, 2006 WL 659475 at *7 (D. Neb). Here, both PO Penrod and Det. Burton testified about the strong ether-like chemical odor that they associated with the manufacture of methamphetamine.

"Despite protections of the Fourth Amendment, and the preference for search warrants, a search without a warrant is legal where 'justified by both probable cause and exigent circumstances.'" United States v. Kleinholz, 339 F.3d 674, 676 (8th Cir. 2003) quoting United States v. Walsh, 299 F.3d 729, 733 (8th Cir. 2002) (internal citations and quotations omitted). "In certain narrow situations, therefore, exigency may be substituted for a warrant but probable cause must be present before either a warrant or exigency will allow a search." Kleinholz, 339 F.3d at 676.

"Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." Id., citing United States v. Fladten, 230 F.3d 1083, 1085 (8th Cir. 2000). In the present case several factors support the existence of probable cause. First, the Officers had information from an identified witness who lived next door to defendant's residence that there was a strong chemical odor in the area. The witness said the residence belonged to "Reed." It is fair to assume that the witness, who lived in an apartment provided by Union's Drug Court, had some familiarity with the implications suggested by chemical odors. Secondly, PO Penrod smelled what he believed to be ether, a substance known to be used in the manufacture of methamphetamine. United States v. Francis, 327 F.3d

729, 736 (8th Cir. 2003). "The smell of ether might alone support a finding of probable cause." Kleinholz, 339 F.3d at 677 citing United States v. Clayton, 210 F.3d 841, 845 (8th Cir. 2000) (holding officer "developed probable cause for a search based on his immediate perception of an odor associated with methamphetamine production"). In addition, when Det. Burton arrived he also smelled a strong odor of what he believed to be ether. Det. Burton was a certified methamphetamine/clandestine lab investigator and had much experience with the use of ether to manufacture methamphetamine. Third, the Officers observed a fan blowing air out of an open bathroom window in the corridor from which the odor was emanating. It was approximately 1:15 a.m. and the temperature was only in the mid-thirties. These facts taken together indicated probable cause to believe defendant Reed's residence contained evidence of a methamphetamine lab or of methamphetamine manufacturing. [6]

Because of the volatile nature of such labs together with the health hazards of inhaling the fumes produced during the manufacturing process, an immediate search was justified. Kleinholz, 339 F.3d at 677. See Walsh, 299 F.3d at 734. ("The potential hazards of methamphetamine are well documented and numerous cases have upheld limited warrantless searches by police officers who had probable cause

---

[6] Defendant's Supplemental Memorandum of Law (Doc. 32 at p.3-5) argues vigorously that the officers lacked probable cause. However, as noted above "Probable cause exists when, given the totality of the circumstances, *a reasonable person* could believe there is a *fair probability* that contraband or evidence of a crime would be found in a particular place." Kleinholz, 339 F.3d at 676, citing United States v. Fladten, 230 F.3d 1083, 1085 (8th Cir. 2000) (emphasis added).

to believe they had uncovered an on-going methamphetamine manufacturing operation.") (Collecting and then following authority from other circuits). The Eighth Circuit clearly considers safety factors when deciding whether exigent circumstances exist. United States v. Williams, 431 F.3d 1115, 1118 (8th Cir. 2005). "The existence of exigent circumstances is an objective analysis 'focusing on what a reasonable experienced police officer would believe.'" Williams, 431 F.3d at 1118 citing United States v. Kuensltler, 325 F.3d 1015, 1021 (8th Cir. 2003).

Here, the witness and both the testifying Officers smelled the strong ether-like chemical odor, and the fan in defendant's bathroom window was blowing air into the corridor from which the odor emanated. The Officers tried the knock and talk approach discussed above; however, there was no response to the knocking at the front door, the light went off in the bathroom, people were heard talking inside the backdoor but there was still no response to the knocking and announcing "Police" or to the warning that if they did not open the door, the officers would kick it in. It is reasonable that an experienced officer such as Det. Burton would conclude that the residence contained a methamphetamine lab or methamphetamine manufacturing of some sort and that exigent circumstances were present. United States v. Lloyd, 396 F.3d 948, 954 (8th Cir. 2005). The forced entry was lawful under the totality of the circumstances.

3.  Consent

The consent issue may be moot because probable cause and exigent circumstances combine to support the search. Kleinholz, 339 F.3d at 678.

Nevertheless, the court will examine the consent issue. It is clear from the testimony from both PO Penrod and Det. Burton that most likely defendant was not advised of his Miranda rights.

The Eighth Circuit has clearly held that Miranda warnings are not necessary before a consent to search is requested and given. United States v. Washington, 957 F.2d 559, 563 (8th Cir.), cert. denied, 506 U.S. 883, (1992). Because requesting consent to search is not likely to elicit an incriminating statement, such questioning is not "interrogation" and thus Miranda warnings are not required. United States v. Glenna, 878 F.2d 967 (7th Cir. 1989); Cody v. Solem, 755 F.2d 1323 (8th Cir.), cert. denied, 474 U.S. 833 (1985).

It is undisputed that persons may give up their Fourth Amendment rights by consenting to a search. Schneckloth v. Bustamonte, 412 U.S. 218, 221 (1973). Det. Burton asked defendant if he would consent to a search of the residence. Defendant responded to the effect "this ain't my apartment, I don't care what you do." Det. Burton testified he believed that to be the equivalent of consent. By any analysis, it is clear that defendant did not refuse to give permission to search. However, consent to search may be given by the criminal suspect or by some other person who has common authority over or other significant relationship to the premises or effects sought to be inspected. United States v. Matlock, 415 U.S. 164, 171 (1974); United States v. Adams, 346 F.3d 1165, 1170-71 (8th Cir. 2003); United States v. Czeck, 105 F.3d 1235, 1239 (8th Cir. 1997); United States v. Bradley, 869 F.2d 417, 419 (8th Cir. 1989). "Common authority is a function of mutual use, joint access and control."

United States v. Janis, 387 F.3d 682, 686 (8th Cir. 2004) quoting United States v. James, 353 F.3d 606, 613 (8th Cir. 2003) "[A]n adult co-occupant of a residence may consent to a search." United States v. Jones, 193 F.3d 948, 950 (8th Cir. 1999).

There is no requirement that a consent to search be given in writing: ". . . A search may be justified by a voluntary oral consent in the absence of a valid written consent." United States v. Chaidez, 906 F.2d 377, 382 (8th Cir. 1990). See, United States v. Medley, 206 WL 3247200 at *9 (E.D. Mo) (no written consent required as long as oral consent received). Here, Det. Burton spoke with Katie Pittman, defendant's girlfriend, who lived with her child in the residence. She consented to the search.

A c0-habitant girlfriend has been found to have common authority to consent to a search of the residence even though she had no property interest in the residence. United States v. Nichols, 574 F.3d 633, 636 (8th Cir. 2009). A search may be valid when based on the consent of a party whom the police reasonably believe to have authority to consent even if it is later determined that the party did not in fact have such authority. Illinois v. Rodriguez, 497 U.S. 177, 185-186 (1990). "[E]ven where third-party consent comes from an individual without actual authority over the property search, there is no Fourth Amendment violation if the police conducted the search in good faith reliance on the third-party's apparent authority to authorize the search through her consent." United States v. Purcell, 526 F.3d 953, 963 (6th Cir. 2008). Here, Katie Pittman had both actual as well as apparent authority over the residence. She told the Officers she lived there with her son. Her

consent was valid and the search lawful regardless of how defendant characterizes his own statement.

All the objects seized pursuant to the search are items known to be associated with methamphetamine manufacturing or methamphetamine labs.

Accordingly,

**IT IS HEREBY RECOMMENDED** that defendant's Motion to Suppress Statements and Evidence be **DENIED** in its entirety. [Doc. 21]

The parties are advised that they have fourteen (14) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Trial in this case is set on **October 1, 2012** at **8:30 A.M.** before the Honorable Catherine D. Perry.

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this   14th   day of August, 2012.